UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| NEXUS DX, INC., ) | |
| ) | C.A. No. 0:09-cv-02868-CMC |
| Plaintiff, ) | |
| ) | OPINION AND ORDER |
| vs. ) | ON MOTION FOR DAMAGES, |
| ) | ATTORNEYS' FEES, AND |
| DENNIS BARR, d/b/a DENNIS BARR ) | ENTRY OF JUDGMENT |
| CONSULTING LLC and KENT SELF, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

This matter is before the court on Plaintiff's motions for a determination of injunctive relief and damages, entry of default judgment, and an award of attorneys' fees and costs. Dkt. Nos. 57, 58, 60. Plaintiff seeks this relief under its claims for Trademark Infringement under 15 U.S.C. § 1114 *et seq.* ("Infringement Claim") and violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 35-5-10 *et seq.* ("SCUTPA Claim"). As neither Defendant has responded or otherwise objected to Plaintiff's request for resolution of these issues on the present motions, the court resolves them on the written record.

For the reasons set forth below, the court grants Plaintiff's motions and awards injunctive relief, damages, attorneys' fees and costs. The extent of the relief granted in each category is, however, less extensive than Plaintiff seeks. <u>Because the court has awarded damages under two alternative theories of relief, Plaintiff will be required to make an election of remedies before judgment is entered.</u>

**LIABILITY AND DEMAND FOR RELIEF**

Liability for the various causes of action asserted in the amended complaint has been established by Defendants' default. *See* Dkt. No. 26 (January 27, 2010 entry of default as to Kent

Self ("Self")), Dkt. No. 49 (August 16, 2010 entry of default as to Dennis Barr ("Barr")).[1] Although the amended complaint asserts other causes of action, Plaintiff seeks relief here only under its Infringement and SCUTPA Claims.[2]

As to the Infringement Claim, the allegations of the amended complaint, which are deemed admitted by virtue of Defendants' default, establish that Defendants violated 15 U.S.C. § 1114 by infringing on Plaintiff's trademark in its Cardiac STATus® brand disgnostic kits ("CS Kits"), a kit sold to medical providers and used to diagnose heart attacks. Dkt. No. 9 ¶¶ 15, 56-73 (first cause of action). Defendants (primarily Barr) are alleged to have infringed on Plaintiffs' trademark either by selling kits which were marked as CS Kits but did not originate from Plaintiff (or its predecessor) or which may have originated from Plaintiff's predecessor but were not handled in the manner necessary to assure proper quality control.[3] Based on these and other allegations, Plaintiff seeks "Defendants' profits, treble damages suffered by Nexus and/or [its predecessor, Nanogen (*see* n.3)]

---

[1] An earlier entry of default as to Barr was vacated on Plaintiff's motion. Dkt. Nos. 27-29, 34, 37. That motion was filed after Plaintiff learned that the "Dennis Barr" initially served was not the Dennis Barr whose actions are at issue here. Dkt. No. 34.

[2] The amended complaint also alleges claims for false designation of origin under (15 U.S.C. § 1125), violation of the South Carolina Trade Secrets Act (S.C. Code Ann. § 39-8-10 *et. seq.)*, conversion, and fraud.

[3] Prior to July 2008, Barr was employed by Plaintiff's predecessor, Nanogen, Inc., or a subsidiary of that company (collectively "Nanogen"). Dkt. No. 9 ¶¶ 17, 26. In mid-2009, Nanogen declared bankruptcy. *Id.* ¶ 18. Through a series of transactions relating to that bankruptcy, Plaintiff acquired the Cardiac STATus product line and all related rights from Nanogen, including the right to pursue any related causes of action. *Id.* ¶¶ 19-25. Between the time Barr's employment ended and when Nanogen ceased doing business, Barr obtained a number of CS Kits from an unauthorized source. *Id.* ¶ 27. These kits were not maintained and sold consistently with Nanogen and Plaintiff's quality control practices which require that CS Kits be stored in a dry, climate controlled environment, that expired CS Kits be discarded, and that records be kept of sales so that recalls or other corrective measures may be taken to ensure product safety. *Id.* ¶¶ 28-29.

and the costs of this action, including reasonable attorney's fees" pursuant to 15 U.S.C. § 1117. *Id.* ¶ 71. Plaintiff also seeks injunctive relief under 15 U.S.C. § 1116.[4]

As to its SCUTPA Claim, Plaintiff alleges that the "unfair and deceptive conduct was done knowingly and/or willfully" and that "Plaintiff has been injured by such conduct." Based on these and other incorporated allegations, Plaintiff seeks treble damages, attorneys' fees and costs. Plaintiff also alleges under this claim that Defendants will continue the unfair and deceptive activities unless enjoined, although Plaintiff's present motion seeks injunctive relief only under the Infringement Claim.

**PARTIAL ELECTION OF REMEDIES**

As discussed above, the amended complaint asserts six causes of action, most of which are asserted against both Defendants. The present motions, however, seek relief only under the Infringement and SCUTPA Claims. Plaintiff has, therefore, elected to proceed only as to these two claims.

Plaintiff has further limited the relief it seeks against Self to injunctive relief. Plaintiff's pursuit of injunctive relief (against both Defendants) is pursued solely under 15 U.S.C. § 1116. *See* Dkt. No. 57 at 3-8. The court accepts this as an election of remedies (as to the basis for injunctive relief) as to both Defendants and as a limitation on the remedies sought as to Self.

Plaintiff also seeks treble damages, attorneys' fees and costs from Barr. This relief is sought both under the Infringement Claim (15 U.S.C. § 1117) and the SCUTPA Claim. For reasons

---

[4] The amended complaint also seeks return of any kits which are or purport to be CS Kits under 15 U.S.C. § 1118. The present motions do not, however, request this form of relief.

addressed below, the court awards identical relief under both claims. Plaintiff will, nonetheless, be required to make an election of remedies to avoid duplication of recovery

## INJUNCTIVE RELIEF

Plaintiff requests both negative and affirmative injunctive relief. Dkt. No. 57 at 6-7. The first category of relief requests an injunction prohibiting both Defendants from "(1) selling any unauthorized diagnostic kits in association with the Cardiac STATus mark or any other confusingly similar marks; or (2) engaging in any activities that would otherwise infringe Nexus' trademark rights in the Cardiac STATus mark." Dkt. No. 57 at 6. The court finds the requested negative injunctive relief appropriate and awards the same.

In addition, Plaintiff asks the court to require Barr to undertake corrective advertising and to disclose the identities of customers to whom he marketed the infringing goods. Plaintiff also seeks an order requiring both Defendants to file a written affirmation (within thirty days of entry of this order) that they have complied with the injunction. *Id.* at 6-8. These requested forms of relief go beyond what was requested in the amended complaint.[5]

---

[5] Plaintiff concedes that the amended complaint does not demand corrective advertising as a form of injunctive relief. *Id.* at 6. Plaintiff does not address whether the complaint gives notice of the other forms of affirmative injunctive relief now sought. The court has, therefore, searched the amended complaint (Dkt. No. 9) and finds only the following references to injunctive relief relevant to either of the claims on which Plaintiff now proceeds: (1) a demand pursuant to 15 U.S.C. § 1116 for unspecified injunctive relief under the Infringement Claim (¶ 72); (2) a demand pursuant to 15 U.S.C. § 1118 for return of any unauthorized kits still in Defendants' possession under the same claim (¶ 73); (3) a statement under the SCUTPA Claim that "Defendants' acts will be repeated unless enjoined" (¶ 87); and (4) a specific demand in the ad damnum clause for "[a] temporary and permanent injunction [under 15 U.S.C. § 1116 ] preventing Defendants from selling any of the unauthorized kits and/or infringing Nexus' trademark rights[.]" ). The demand for return of kits was made pursuant to 15 U.S.C. § 1118 under the Infringement Claim. It is also pursued under other causes of action. *See id.* at 16 ¶ J (demand as to conversion claim); *id.* at 12 ¶ 79 (seeking relief under 15 U.S.C. § 1118 for false designation of origin). Neither this form of relief nor Section 1118 are, however, referenced in Plaintiff's present motions.

4

Given Barr's failure to make any appearance in this action and Plaintiff's inability to locate him for purposes of conducting discovery (*see infra* n. 7), it is somewhat doubtful that Barr will receive actual notice of this order – particularly within any specified period of time. It follows that imposing a requirement for affirmative action (particularly within a specified period) is not likely to have any beneficial effect. It would, instead, prolong this matter given the near inevitability of a contempt motion.

There is, moreover, no evidence that Barr is continuing to engage in any of the alleged infringing activities or has done so since mid-2009, when Plaintiff received notice of Barr's infringing activities.[6] What evidence of infringing actions has been proffered is limited to sales by Barr to two customers of Plaintiff's predecessor and to one prospective customer. The customers fall within a group for which Plaintiff presumably has contact information and with whom Plaintiff likely has had repeated contact since mid-2009. Given the nature of pharmaceutical sales, Plaintiff likely has had some contact with other prospective customers and has, at least, had the opportunity for such contacts. Plaintiff has, therefore, had the opportunity to communicate Barr's non-authorization to sell the CS Kits during this period. Given the absence of evidence of any infringing sales since mid-2009, these considerations persuade the court that the requested affirmative injunctive relief is not warranted.

---

[6] Plaintiff's proffered evidence (discussed under "Damages" below) suggests Barr's infringing sales were made between January and August 2009, and that Defendant received notice of these activities between June and September 2009. Dkt. No. 57-1 to 57-3. No evidence of later infringing activity has been offered.

5

**DAMAGES**

Plaintiff seeks damages solely from Barr. Excluding attorneys' fees and costs, the damages sought fall into two categories: (1) damages based on Barr's sales; and (2) damages for injury to Plaintiff's reputation. Both categories of damages are pursued under both the Infringement and SCUTPA Claims.

**Damages based on Barr's sales.** The evidence offered in support of the claim for damages based on Barr's sales consists of three documents.[7] Each of these documents is offered without any authentication or explanatory affidavit.

The first document is a copy of an October 20, 2009 email from Cynthia Erb ("Erb") to counsel in this action. Dkt. No. 57-1. As Erb has a "nexus-dx.com" email address, the court presumes she is an employee of Plaintiff, though no evidence of her status is offered. The purpose of the email to counsel was apparently to forward a June 15, 2009 communication which Erb emailed to two other individuals whose positions are not revealed. This earlier email summarizes Erb's recollection of a February (presumably 2009) conversation she had with Jeff Shook, Vice President of purchasing for Seneca Medical. According to Erb, Shook expressed concerns relating to his recent purchase of "50 x CS3002" from Barr.[8] Erb states that she asked Shook to send her the

---

[7] The present motions were filed after entry of default and a substantial, post-default period which was allowed for discovery as to damages. *See* Dkt. No. 50 (August 20, 2010 motion for discovery); Dkt. No. 51 (August 20, 2010 order directing Barr's participation in discovery), 57, 58, 60 (February 28, 2011 motions for awards of damages, injunctive relief, default judgment and attorneys' fees). Due to a failure of service, that discovery was never conducted. *See* Dkt. Nos. 54 (docket text order seeking status report); 55 (status report); 56 (order declining to allow additional time for service or completion of discovery).

[8] The term "CS3002" is not explained in this email or by any explanatory affidavit. The court will, however, assume that it is the term used by Plaintiff to refer to CS Kits. The court will, for the moment, also disregard the double hearsay concerns presented by this email.

6

packing list and invoice from Barr but that he never did so. Nonetheless, she refers to the total invoice price claimed by Shook, $18,000. Although the email does not state that Shook claimed to have paid this amount for CS Kits, Plaintiff's argument assumes this to be the case.[9]

The second document offered as evidence of Barr's sales is an invoice dated May 28, 2009. The face of this invoice indicates it was issued by Dennis Barr Consulting, LLC, to Express Medical Care for "60 Test kits @ $24.75/20 test kits per tower" for a total price of $1,485. The kits are further identified as "Cat. No. CS3002/20 count MYO/Tnl/CK-MB Tandem Test." Dkt. No. 57-2. No authentication of this invoice or explanation for how or when it came into Plaintiff's possession is offered.

The third and final document is an email string between Erb and john.ritter@correcthealth.org. Dkt. No. 57-3. The first email in the string is from Erb to Ritter on September 22, 2009. This email advises of the availability of "A10-CS3002" kits and appears to be in response to an oral communication from Ritter. After receiving Ritter's response, Erb wrote: "Would it be possible for you to please send us the Lot Number of the Cardiac Status product that you still have in stock and the approximate date when you first received product from Dennis Barr?" Ritter responds indicating, in part, that the only paperwork he still has consists of three invoices from Barr which he promises to scan and send "later today."[10] He summarizes the three orders as follows: (1) January 22, 2009 order for five twenty-unit towers at $24.50 per unit (total $2,450); (2)

---

[9] If the full $18,000 was for "50 x CS3002," the unit price of each CS Kit would be $360. In contrast, the unit price for CS Kits suggested by the two items of evidence discussed below ranges from $24.50 to $25.75. Under these circumstances, any assumption that the full amount of the claimed invoice was for CS Kits strains credulity.

[10] The referenced documents are not included in the record. Neither is there any explanation of whether they were provided as promised.

7

April 28, 2009 order for five twenty-unit towers at $24.50 per unit (total $2,450); and (3) August 3, 2009 order for two twenty-unit towers at $24.50 per unit (total $980).

Based on the above proffer, Plaintiff argues that it is entitled to damages of $25,365 measured by Barr's sales. As Plaintiff correctly notes, it need only prove the amount of the sales in order to shift the burden to Barr to prove "all elements of costs or deduction claimed." 15 U.S.C. § 1117(a). Because Barr has not responded to any of Plaintiff's motions, there is no evidence of such costs or deductions. Therefore, to the extent the above evidence establishes sales of kits represented by Barr to be CS Kits, the court may award Plaintiff the full sales amount (up to the requested amount of $25,365).

As noted above, the proffered evidence is entirely unauthenticated. Plaintiff has, for example, failed to offer an affidavit of Erb or any other person establishing the authenticity of the two email strings. Likewise, there is no sworn statement that the information reported by Erb in the two emails is accurate, much less any basis on which to accept as true the hearsay statements contained in Erb's emails. The invoice from Express Medical Care is, likewise, entirely unauthenticated – with no explanation being given for how it came into Plaintiff's possession, much less that the facts suggested by the invoice are true (*i.e.* that the sales in fact occurred at the stated prices). Each of these proffered items also suffers from the need to translate "CS3002" to "Cardiac STATus kit," a translation for which no support is provided.[11]

---

[11] Plaintiff's memorandum draws greater meaning from these documents than the court is able to draw. *See* Dkt. No. 57 at 10-11. This added meaning may derive from explanations from interviewing witnesses such as Erb or the deposition of Kent Self. No support for such explanations is, however, presented to the court except as argument of counsel. For example, Plaintiff asserts that "Barr sold Self Regional Medical Center 60 Kits for $1,485 under the false pretense that Barr was an authorized sales representative or distributor of Nexus' diagnostic kits." *Id.* at 10 (referring to invoice to Express Medical Care). Nothing in the record, however, explains that Self Regional Medical Center and Express Medical Care are one and the same or that the term "CS3002" used on

The court would find these various deficiencies sufficient to deny this aspect of Plaintiff's request for relief *if any challenge to the adequacy of Plaintiff's evidence was made*. There is, however, no challenge to authenticity, adequacy, or evidentiary value. The court will, therefore, accept the proffered evidence as if properly authenticated and admissible. The court will also construe this evidence as Plaintiff suggests it should be construed – with one exception. That exception relates to the claim that Barr made an $18,000 sale of CS Kits to Seneca Medical. This claim is supported only by Erb's recitation of a phone report by Seneca Medical's representative that he had received an $18,000 invoice from Barr. Setting aside the hearsay and other concerns, there is no indication that Shook even claimed this invoice was solely for "CS3002" kits. In contrast, the prices charged for CS3002 kits in the two other sales evidenced ranged from $24.50 to $24.75. Applying the higher of these two prices suggests the total charge for 50 kits would have been, at most, $1,237.50. Lacking any better evidence or challenge from Barr, the court will award this amount as damages reasonably supported by the oral report of a sale to Seneca Medical.

With this adjustment, the court awards damages to Plaintiff based on Barr's sales in the total amount of $8,602.50. This includes $1,485 for the sale to Express Medical Care, $5,880 for the sales to CorrectHealth, and $1,237.50 for the sale to Seneca Medical.

Section 1117(a) provides that: "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." Although not argued by Plaintiff, the court has considered whether to adjust the damage award under this section.

---

the invoice to Express Medical Care refers to the product at issue in this action. Neither is there any evidence as to what, if any, representations were made by Barr, thus precluding an inference that he acted under any "false pretense." Plaintiff's decision to sue Self in addition to Barr suggests Self may not have been deceived (assuming he is the "Self" associated with Self Regional Medical Center). Even the source of this invoice is unexplained by any proffer of evidence.

Some factors arguably support an upward adjustment. These include the difficulty of proving Barr's sales in light of Barr's failure to appear and defend and resulting unavailability for discovery. The latter was not cured by the court's post-default discovery order because of an inability to serve Barr. Finally, to the extent Plaintiff has proof of Barr's sales, it was only obtained through the fortuity of customer complaints, suggesting that he may have made substantially more sales.

Other factors, however, militate against an upward adjustment. First, Barr's failure to defend has also provided Plaintiff with certain advantages. These include the deemed admission of all allegations. Barr's failure to respond to the motion for damages, likewise, benefits Plaintiff in that the entirety of the proven sales are deemed profits (lacking any proof of Barr's costs). The court is also reluctant to give Plaintiff the benefit of an upward adjustment of the profit award when Plaintiff has done such a limited job of proving what damages are within its power to prove.[12]

Taking all of these factors into consideration, the court declines to adjust the profits component of the damages award. The court, therefore, leaves this award at $8,602.50.

**Damages to Plaintiff's reputation.** Plaintiff also seeks $300,000 for damages to its reputation. This claim is supported by the declaration of Edward F. Brennan, who serves as Chief Integration Officer of Nexus. Brennan's declaration explains the history and value of the mark and transactions leading to Plaintiff's ownership of it. He also explains the efforts Plaintiff and its predecessor have invested and continue to invest in protecting the reputation and goodwill associated with the mark. He then states as follows regarding possible damage flowing from Barr's activities:

---

[12] Most critically, as noted above, Plaintiff failed to provide affidavits or other authenticating and explanatory evidence as to the two emails and invoice.

> 14. I am aware that Dennis Barr d/b/a Dennis Barr Consulting, LLC ("Barr") has been using the Mark to sell or otherwise distribute unauthorized Kits that have not been subjected to Nexus' quality control practices and standards (the "Infringing Kits") to both established and potential customers of Nexus. These Infringing Kits are certainly of inferior quality to the authorized Kits sold by Nexus.
>
> 15. I am specifically aware that Barr has on multiple occasions, sold Infringing Kits to two Nexus established customers and to one potential customer with whom Nexus had not previously done business.
>
> 16. It is my opinion that the activities of Mr. Barr have severely damaged the reputation of Nanogen and Nexus and the good will associated with the Mark.
>
> 17. I am aware that both of the established customers to whom Barr sold the Infringing Kits complained to Nexus and looked to Nexus to refund the amounts paid and/or to replace the Infringing Kits sold by Barr.
>
> 18. Based on dealings with customers regarding Barr's actions, I believe that Nexus has suffered approximately $300,000 in reputational damage in addition to the damages associated with the corretive actions Nexus has been forced to take to rectify Barr's actions.

Dkt. No. 57-4 at 4.

As this declaration fails to identify any specific established or prospective customers (collectively "customers"), the court can only assume that the three customers referenced are the three referenced in the two emails and one invoice offered as evidence of Barr's sales (discussed above). Brennan's failure to identify these customers or to testify to any specific communications with them suggests that his knowledge of these customers' reactions to Barr's activities is no greater than what the court can glean from the limited, unauthenticated information addressed above.[13] That information does not support a finding that Plaintiff's reputation was damaged as a result of Barr's

---

[13] Brennan's declaration is the only support offered for Plaintiff's damage claim other than the unauthenticated emails and invoice referenced above. Nothing in the emails or invoice suggests that Brennan had any direct involvement or contemporaneous knowledge of the events referenced in those documents. This, and the absence of any attempt to cure the authentication and other evidentiary gaps as to the sales-damages claims through Brennan's affidavit persuade the court that Brennan lacks first-hand knowledge of the relevant communications and events.

11

activities. Instead, it suggests that Plaintiff learned of and was able to correct any misimpressions resulting from Barr's sales to these particular customers.

The fortuitous manner through which Plaintiff apparently learned of these sales suggests some probability that Barr made sales to other customers which were never made known to Plaintiff. This might, in turn, suggest a possibility that Plaintiff's reputation was damaged as a result. That possibility is, however, merely speculative absent some further support.

Despite his claim of personal knowledge of reputation damage, Brennan's declaration does not suggest any support for such a claim. For example, he does not suggest that either of the two existing customers who purchased from Barr subsequently purchased fewer CS Kits from Plaintiff. Neither does he suggest that the prospective customer subsequently declined to purchase Plaintiff's products based on some reason linked to Barr's activities. Brennan also fails to present any evidence of a reduction in or slowed growth of sales of CS Kits following Barr's activities or any other evidence of injury to reputation.

Brennon, likewise, fails to offer support for the claim that Plaintiff engaged in or had costs associated with corrective actions. While these costs might reasonably be compensated through a damage award, the court cannot do so without some supporting evidence such as the costs of sending letters to or otherwise contacting customers.

Finally, despite offering his opinion that Plaintiff has suffered damages to its reputation in the amount of $300,000, Brennan offers no indication of how he arrived at that amount. He does not suggest either the measures used or values placed on any such measures.

In light of the superficial nature of the critical portions of Brennan's declaration, the court concludes that his declaration cannot support an award of damages for injury to the protected mark's

reputation. As Plaintiff has failed to present any other evidence of such injury, the court declines to award any damages for reputational injury.

## TREBLING OF DAMAGES

15 U.S.C. § 1117(b) directs the court to enter judgment as to specified categories of claims of three times the greater of the award of the infringer's profits *or* Plaintiff's damages unless the court finds extenuating circumstances. In light of the allegations of the amended complaint, which are deemed admitted by virtue of Barr's default, Plaintiff's Infringement Claim falls within the categories for which treble damages shall be awarded absent extenuating circumstances. As no evidence of extenuating circumstances has been presented, the court trebles the award of damages measured by Barr's profits. Thus, the court awards $25,807.50 (3 times $8,602.50).

## INFRINGEMENT CLAIM VS. SCUTPA CLAIM

The preceding discussion of available damages is addressed primarily under the federal Infringement Claim. The same categories of damage are, however, available under the South Carolina Unfair Trade Practices Act. Lacking any opposing argument, the court awards the same actual damages under the SCUTPA Claim as under the Infringement Claim. In addition, the court trebles the award for willfulness, which is deemed admitted by virtue of the default.

The court also finds an award of attorneys' fees and costs warranted in the same amount under both statutes. The amount of those awards is discussed below.

## ATTORNEYS' FEES

Plaintiff has filed both a motion for costs and attorneys' fees and a supplemental motion for attorneys' fees. Dkt. Nos. 58, 60. The first-filed motion seeks fees for work of South Carolina counsel in the amount of $23,319.70 for 101.39 hours of work at $230 per hour. Dkt. No. 58 at 2. In addition, it seeks costs in the amount of $1,988. *Id.* at 1. The costs sought include $1,471 paid

13

to a process server to find and serve Barr. *Id.* The supplemental motion seeks fees for California counsel. This motion seeks attorneys' fees in the amount of $14,0857.50 for 40.25 hours of work at $350 per hour.

Both motions are supported by the filing attorneys' own affidavits and outside attorneys' affidavits as to reasonableness of the rates relative to the geographic area in which the filing attorneys practice law. Neither motion is supported by any breakdown of how the time for which compensation is sought was expended or other documentation of the hours worked beyond a fairly generic description of the work performed. This generic description is precisely the same in both motions:

> The time billed includes, without limitation, preparing, reviewing, finalizing and filing (1) the initial pleadings, including the Amended Complaint and Motion for Preliminary Injunction; (2) the status reports regarding the service of Barr; (3) the default documents; (4) the Motions for Leave to Serve Discovery, including the proposed discovery plans; and (5) this petition and affidavit of attorney fees.

Dkt. No. 58 at 2; Dkt. No. 60 at 2.

The identical descriptions of the work performed by counsel suggest duplication of effort. No other evidence of the work performed is presented. On this record, the court declines to award fees for the work of both attorneys. The court will, however, award the larger of the two amounts sought which is for the work of South Carolina counsel: $23,319.70. The rate sought for this attorney is properly supported, relevant to the geographic area in which the matter is pending, and reasonable in light of the various factors set forth in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216 (4th Cir. 1978). The court also finds the total time expended by this attorney reasonable in light of the competing considerations of the complexities of the legal theories, the simplicity of proof of liability in light of Defendants' default, and the minimal proof of damages offered. While the court might otherwise reduce the hours awarded for this attorney's work due to the limited award of damages,

14

it concludes that denial of fees for the second attorney's work is sufficient to account for any reduction which might otherwise have been made on this or any other basis.

The court also concludes that the costs sought should be reduced. Plaintiff seeks $1,988 in costs of which $1,471 was "paid to a process server to find and serve Barr." Dkt. No. 58 at 1. As no further support or breakdown is offered, the court can only assume that much of the process server's time was spent tracking the wrong "Dennis Barr," who was the person initially served.[14] The court will, therefore, allow only half of this amount ($735.50).

For the reasons set forth above, the court awards costs in the amount of $1,252.50 and attorneys' fees in the amount of $23,319.70.

## ELECTION OF REMEDIES

As indicated above, the court awards injunctive relief against both Defendants under the Infringement Claim and trebled damages of $25,807.50 against Barr under the Infringement Claim and the SCUTPA Claim. Although the damage award is the same under both claims, Plaintiff may may only receive a single recovery. Plaintiff will, therefore, be required to elect between the two remedies to the extent of the damage award. In addition, the court awards attorneys' fees of $23,319.70 and costs of $1,252,50 against Barr. This award is applicable to all claims.

## CONCLUSION

For the reasons set forth above, both Defendants are permanently enjoined from (1) selling any unauthorized diagnostic kits in association with the Cardiac STATus® mark or any other confusingly similar marks; or (2) engaging in any activities that would otherwise infringe Nexus'

---

[14] The improperly served Dennis Barr was located in another state. Defendant Dennis Barr was, ultimately, located in the same small community of Clover, South Carolina which is listed on the invoice provided as evidence above. This is not to suggest that he did not make himself difficult to find within that small community. Nonetheless, it suggests that not all of the costs should be awarded.

15

trademark rights in the Cardiac STATus® mark. In addition, the court awards trebled damages against Defendant Barr of $25,807.50 under the Infringement and SCUTPA Claims. Although the amount awarded is the same under both claims, Plaintiff must make an election of remedies to avoid a double recovery. The court also awards attorneys' fees of $23,319.70 and costs of $1,252,50 against Defendant Barr. The fees and costs are awarded jointly under the Infringement and SCUTPA Claims and shall be the same regardless of Plaintiff's election. All other claims are dismissed with prejudice based on Plaintiff's election of remedies as evidenced in its present motions.

<u>Judgment will be withheld until Plaintiff makes its election between the damages remedies. This election shall be made no later than April 8, 2011</u>.

IT IS SO ORDERED.

       s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
March 31, 2011